**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| SALLY LYDDY and | : |
| MARIA MARCOCCIA, | : |
|     Plaintiffs, | : |
| | : |
|       v. | :         3:06-cv-1420 (CFD) |
| | : |
| BRIDGEPORT BOARD OF EDUCATION | : |
| and ANDREW CIMMINO, | : |
|     Defendants. | : |

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

This is an employment discrimination case brought by two employees of the Bridgeport

Board of Education against the Board and Andrew Cimmino, principal of the Thomas Hooker

School from 2001 to 2007. Plaintiffs each bring Title VII claims against the Board, and a

common law intentional infliction of emotional distress claim against Cimmino.[1]

## I.    Background[2]

Plaintiff Sally Lyddy is a former employee of the Board who worked at the Thomas

Hooker School from 1990 until 2004. She served as Cimmino's secretary. Plaintiff Maria

Marcoccia also is a former employee of the Board who worked at the Thomas Hooker School

from 1988 until 2004 as a home school coordinator. From 2002 to 2003, she also served as the

sexual harassment officer for the school. In addition, Ms. Marcoccia was employed after school

and during the summer by Sacred Heart University as site coordinator for the federally funded

Lighthouse Program. The Lighthouse Program was an after-school program which provided safe

---

[1]The operative complaint is the Fourth Amended Complaint [Dkt. # 163].

[2]The facts related herein are taken from the parties' Rule 56 statements, depositions, affidavits and supporting exhibits and are undisputed except where otherwise noted.

educational, cultural and recreational opportunities for disadvantaged children. This after-school program was also located at the Thomas Hooker School.

Lyddy and Marcoccia state that their problems with Cimmino began early in 2002. They stated in their affidavits that Cimmino would frequently make sexual comments and jokes in the office, would display sexual images on his computer, and repeatedly ask female teachers and staff at the school to have drinks with him. Among the incidents Lyddy and Marcoccia described in their affidavits in this case, and during a separate investigation conducted by a lawyer hired by the Board are:

(1) Cimmino wore a tie to work which was illustrated with naked women.

(2) Cimmino viewed pornographic material on his computer screen in his office. He asked Marcoccia on various occasions to view the material.

(3) Cimmino told staff members that he regularly visited a nudist trailer park on weekends.

(4) Cimmino invited Lyddy to accompany him to the nudist camp.

(5) Cimmino referred to the female Director of Human Resources as "that bitch in Human Resources" and referred to a woman in the payroll department as "that bitch in payroll."

(6) Cimmino flaunted a device used "to heighten sexual arousal and stamina in men."

(7) Cimmino told Marcoccia to "take it home to her husband."

(8) Cimmino gave a staff member thong underwear bearing the inscription "Hooker" and later asked to see it.

(9) Cimmino left a sex-oriented newspaper on Marcoccia's desk, in Lyddy's presence.

(10) Cimmino boasted to Lyddy and Marcoccia of his trips to a New York "S&M" club.

(11) Cimmino invited male teachers to go to the S&M club.

(12) Cimmino called both Lyddy and Marcoccia into his office to look at his computer screen, on which there was an image of a carton of eggs, and when Cimmino clicked on an egg an image of a penis or a breast popped out of the cracked eggshells.

(13) At a Christmas party in December 2003, Cimmino pinched Marcoccia's buttocks in front of her husband, Lyddy, and Lyddy's husband.

(14) On one occasion, Cimmino told another teacher, Heather Chanaca, "Ms. Chanaca, what a porn flick you'd make in that outfit."

(15) When the subject of Florence Verlata—a tutor at the school rumored to be Cimmino's mistress—came up, Cimmino told Marcoccia and Lyddy that he was "f—ing her."

(16) On several occasions, Cimmino would say to a male teacher, "Go have your love slave do it."

(17) Cimmino approached Rachel Hibbs, an intern, rubbed her arm and asked "Why don't we go for a drink tonight?"

Plaintiffs also stated that at times they saw Cimmino behaving inappropriately with male students. Specifically, they state that on several occasions Cimmino restrained a special education student with masking tape over his mouth and around his body. Also, they say that he had a kindergarten boy lie across his lap while Cimmino massaged his buttocks, when both Lyddy and Marcoccia were present.

In their affidavits, Lyddy and Marcoccia testified that they brought up Cimmino's

inappropriate conduct to Cimmino himself and to various officials in the school district beginning in 2003. They stated in their affidavits that they spoke with or called Board member Nancy Hornyak, Superintendent Sonia Salcedo, Assistant Superintendent Dr. Robert Britto, former mayor Thomas Bucci, the teachers' union president, Sandra McLeod (who was principal at another school), and Carole Pannozzo, Executive Director of Human Resources for the Board of Education. Plaintiffs said all these contacts took place between the fall of 2003 and June of 2004. However, Pannozzo stated in her affidavit that Marcoccia first reported a complaint about Cimmino to her office, the Personnel Office of the Board of Education, on July 2, 2004. The Board's sexual harassment policy instructs employees to bring complaints to either their supervisors or the Personnel Office. Pannozzo said there is no record of Lyddy making a similar complaint to the Personnel Office.

After Pannozzo made a report of Marcoccia's allegations, Assistant Superintendent Britto conducted his own investigation. The Board then retained outside legal counsel, Lisa Grasso Egan, to investigate the allegations against Cimmino. Egan issued a report ("the Egan Report") concluding that Cimmino had violated the district's Sexual Harassment Policy, and the Board imposed disciplinary action against him, including suspension without pay.

During the summer of 2004—when Lyddy and Marcoccia were making formalized complaints about Cimmino's conduct—Cimmino reported allegations that Marcoccia was misusing the Lighthouse Program's funds. An internal audit by the Connecticut Department of Education concluded that Marcoccia had been misappropriating the program's funds, including overpaying Lyddy (who was working at the program), and writing checks for personal use out of the program's account. Marcoccia eventually pled guilty in state court to larceny in the fifth

degree and tampering with physical evidence, and was sentenced to five years probation and a $5,000 fine. Lyddy was never charged.

At the beginning of the 2004-2005 school year, both plaintiffs transferred to different schools. Pannozzo states that Marcoccia requested re-assignment to the Read School for the 2004-2005 school year, and "expressed satisfaction" with the assignment. In August 2004, Lyddy requested and was granted family medical leave, and when she returned in November, was assigned as a secretary at the Park City Magnet School. Pannozzo states Lyddy "did not object" to this assignment. Plaintiffs argue, however, that the "transfers were effected in retaliation for their continued complaints about sexual harassment and other unlawful conduct."

Shortly after the plaintiffs began at their newly assigned schools, they filed complaints with the Connecticut Commission on Human Rights and Opportunities ("CHRO") on December 16, 2004. Marcoccia's complaint alleged she was discriminated against on the basis of sex and disability (a brain tumor). Marcoccia's complaint specifically alleges that Cimmino began "an on-going [sic] pattern of harassing me. This resulted from the Lighthouse After School Program that I was running for the respondent. Mr. Cimmino demanded that I release the funds for the Light House Program to him to run a tutoring program." Her complaint does not allege any instances of *sexual* harassment. In contrast, Lyddy's complaint alleges discrimination on the basis of sex and mental disorder (depression), and specifically alleges that Cimmino began "a pattern of sexually harassing me." As examples, she alleges "Mr. Cimmino has attempted to get me involved with various social activities, such as going to undesirable bars. He has also tried to get me to go to the nudist resort." Both plaintiffs state in their affidavits that they received a CHRO "right to sue" letter on July 16, 2006 and an EEOC "right to sue" letter on August 9,

2006.[3]

This suit was filed on September 11, 2006. After this Court's prior ruling on the Motions to Dismiss, the remaining claims are Title VII claims against the Board brought by both plaintiffs, and a claim for intentional infliction of emotional distress against Cimmino brought by both plaintiffs. The defendants now move for summary judgment.[4]

## II.      Discussion

### A.      Summary Judgment Standard

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56;  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir. 2000); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994)).  Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor.  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255;

---

[3]Neither plaintiff asserts a disability discrimination in this action.

[4]Defendants have also filed Motions to Strike [Dkt. #221 and Dkt. #235].  Cimmino moved to strike portions of plaintiffs' affidavits.  The Board moved to strike a declaration by plaintiffs' attorney in support of their opposition to the Motions for Summary Judgment. The declaration included as an exhibit a Report of the Attorney General and Child Advocate.

Graham, 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton, 202 F.3d at 134. Consistent with this standard, all evidence favorable to the nonmoving party must be credited if a reasonable jury could credit it. Evidence favorable to the moving party, on the other hand, must be disregarded unless a reasonable jury would have to credit it because it comes from a disinterested source and is uncontradicted and unimpeached. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

B.      Failure to Exhaust Administrative Remedies

A plaintiff may bring an employment discrimination action under Title VII only after filing a timely charge with the federal Equal Employment Opportunity Commission ("EEOC"), or with "a State or local agency with authority to grant or seek relief from such practice." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 82-83 (2nd Cir. 2001) (citing 42 U.S.C. § 2000e-5(e)(Title VII)). In this case, plaintiffs filed a charge with the state CHRO. Exhaustion of administrative remedies is a precondition to filing a lawsuit, and a plaintiff may typically only include in a district court complaint those claims which were included in the administrative proceeding. Id. at 83.

However, even if the district court claims are not identical to the administrative charge, the Second Circuit has recognized three instances in which the district court claims may nevertheless be "reasonably related" to the administrative charges such that the court may

properly exercise jurisdiction.  A district court claim is "reasonably related" to an EEOC or CHRO charge if: (1) "the conduct complained of would fall within the scope of the [administrative] investigation which can reasonably be expected to grow out of the charge of discrimination," (2) the claim alleges "retaliation by an employer against an employee for filing an [administrative] charge," or (3) the claim alleges "further incidents of discrimination carried out in precisely the same manner alleged in the [administrative charge]." Butts v. City of New York Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1402-03 (2nd Cir. 1993).

Lyddy's charges in her CHRO complaint are clearly "reasonably related" to the claims she brings in this lawsuit, and it is undisputed that Lyddy has properly exhausted her administrative remedies.  However, the Board argues that Marcoccia's claims in this suit are not reasonably related to her CHRO charges, and that she has failed to exhaust her administrative remedies.  A comparison of both plaintiffs' CHRO complaints illustrates why Lyddy's is reasonably related to this lawsuit while Marcoccia's is not.  Both CHRO complaints were filed on December 16, 2004, presumably at the same time since they have sequential case numbers (Marcoccia's is 0520284 and Lyddy's is 0520285).  On page one, a standard form, Lyddy wrote that she was "*sexually* harassed and discriminated against" and checked the boxes for sex and mental disorder as the motivating factors for the discrimination.  In contrast, on page one Marcoccia wrote that she was "harassed and discriminated against," and checked the boxes for sex and disability (citing a brain tumor).  Marcoccia's failure to mention any *sexual* harassment continues on pages two and three of the CHRO complaint, which detail the facts that support the claim. On pages two and three of her complaint, Lyddy mentions that Cimmino "began a process of sexually harassing me," including attempting "to get me involved with various social

activities, such as going to undesirable bars" and "the nudist resort." In contrast, Marcoccia neglects to mention any sexual behavior on Cimmino's part. Instead, on pages two and three of her CHRO complaint, Marcoccia alleged that Cimmino had harassed her about her running of the Lighthouse Program. She said Cimmino "demanded that I release the funds for the Light House Program to him to run a tutoring program" and that he "accused me of fraud and other illegal activities." While Marcoccia's CHRO complaint alleged Cimmino treated her this way because of her gender, it did not mention any instances of *sexual* harassment or a hostile work environment.

Because Marcoccia's allegations in the CHRO complaint do not include the charges of sexual harassment that are the basis for this lawsuit, her administrative claims are not "reasonably related" to the claims she makes in this case in any of the three ways articulated by the Second Circuit. First, if the CHRO conducted an investigation into the allegations in Marcoccia's CHRO charges—that Cimmino "demanded" that she release Lighthouse Program funds, and "accused [her] of fraud"—it is unlikely that Cimmino's alleged sexually harassing conduct would fall within the scope of that investigation. Next, Marcoccia does not claim that Cimmino sexually harassed her as retaliation for filing the CHRO charge, since Marcoccia says the harassment began two years before she contacted the CHRO. Finally, the Title VII hostile work environment claim does not allege further incidents of the same type of discrimination alleged in the CHRO charge. Because Marcoccia's Title VII hostile work environment claim in this case is not "reasonably related" to the claims she made in her CHRO complaint, she has not exhausted her administrative remedies with respect to her hostile work environment claim. Therefore, this Court lacks subject matter jurisdiction over that claim. The motion for summary

judgment as to Marcoccia's hostile work environment claim is granted.[5]

## C. Title VII Claims

### 1. *Lyddy's Hostile Work Environment Claim*

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's . . . sex." 42 U.S.C. §2000e-2(a)(1).  The Supreme Court has interpreted the phrase "terms, conditions or privilege of employment" to evince  "a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Systems, 510 U.S. 17, 21 (1993) (internal quotations omitted). A court must look at the totality of the circumstances to determine whether or not an environment is "hostile" or "abusive." Id. at 23.  Harris also established that a subjective and an objective test must be met to prove the existence of a hostile work environment:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

Id. at 21-22.  Also, the Second Circuit has said that "it is axiomatic" that to prevail on a gender discrimination claim based on a hostile work environment, "the plaintiff must establish that abuse was based on her gender."  Kaytor v. Electric Boat Corp., 609 F.3d 537, 547 (2nd Cir.

---

[5]In contrast to her hostile work environment claims, Marcoccia has exhausted administrative remedies with respect to her retaliation claim because her CHRO complaint mentions that she asked for, and was granted, a transfer.  Her retaliation claim is discussed in III.C.2, *infra*.

2010).

Interpreting the facts in the light most favorable to Lyddy, a reasonable jury could find that Cimmino's behavior created a hostile or abusive work environment for Lyddy. The Egan Report contains findings from numerous conversations with other employees at the Hooker School that at least partially corroborate Lyddy's description of Cimmino's activities. Cimmino's display of sexualized photos and images on his computer, his wearing a tie with a picture of a naked woman on it, his references to women in the school and in the district as "love slaves" and "bitches", and his physical contact with female employees all created a work environment that a reasonable person may find abusive, and that Lyddy herself may have found abusive.

In addition to demonstrating a hostile environment, to hold an employer liable for a Title VII violation the plaintiff must also show a basis for attributing the conduct to the employer—in this case, the Board. When the harassment was done by the employee's supervisor, as here, the objectionable conduct is imputed to the employer. See e.g., Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 103 (2nsd Cir. 2010). However, the employer may nevertheless raise the Faragher/Ellerth affirmative defense. The Supreme Court has ruled (in the cases Faragher and Ellerth, among others) that employers are not necessarily liable for sexual harassment committed by their employees. When the sexual harassment comes from an employee's supervisor, as was the case here, a court looks first to whether the supervisor's behavior culminated in a "tangible employment action" against the employee. Burlington Industries v. Ellerth, 524 U.S. 775 (1998). If so, the employer is liable under Title VII. In the absence of a tangible employment action, the employer may nevertheless still be liable "unless it successfully establishes as an affirmative

defense that (a) it 'exercised reasonable care to prevent and correct promptly any sexually harassing behavior,' and (b) 'the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.'" Petrosino v. Bell Atlantic, 385 F.3d 210, 225 (2nd Cir. 2004) (quoting Ellerth, 524 U.S. at 765).

The Board claims it succeeds on a Faragher/Ellerth affirmative defense, first, because there was no tangible employment action taken against Lyddy, since Cimmino always gave her favorable performance reviews, and her transfer to another school in the fall of 2004 was done for reasons unrelated to her allegations of sexual harassment. (See discussion of retaliation, *infra*.) Whether or not Lyddy's transfer constitutes a "tangible employment action" need not be decided, however, because the Board's Faragher/Ellerth defense fails on the other prongs in the summary judgment context. The Board argues it took "reasonable care to prevent and correct" Cimmino's alleged sexual harassment because the Board had a written Sexual Harassment Policy during the period of the Lyddy's employment, which instructs employees to report harassment to a supervisor or the Personnel Office. Also, the Board argues Lyddy "unreasonably failed to take advantage" of their protective processes, because Lyddy delayed reporting any of Cimmino's harassing behavior until December of 2004 when she filed her CHRO complaint. However, in her affidavit and during her deposition, Lyddy stated that she made numerous attempts to contact various officials within the school system to complain about Cimmino's conduct. She testified that she spoke with Cimmino himself, Board member Nancy Hornyak, and Assistant Superintendent Dr. Robert Britto, among others. Interpreting the facts in the light most favorable to Lyddy, these communications do not constitute "an unreasonable failure" to take advantage of preventative measures. A reasonable jury could find that Lyddy took reasonable steps to notify

Bridgeport officials that she felt sexually harassed.  See, e.g., Gorzynski v. Jetblue Airways Corp., 596 F.3d 93 (2nd Cir. 2010) (holding that an employer is not entitled to the Faragher/Ellerth affirmative defense as a matter of law because the plaintiff did not follow the procedures outlined in the employer's sexual harassment policy).  For these reasons, the Board cannot prevail on the Faragher/Ellerth affirmative defense as matter of law in the instant motion.

Therefore, summary judgment on Lyddy's Title VII hostile work environment claim is denied.

### 2. Title VII Retaliation claims

Another provision of Title VII makes it unlawful for an employer to discriminate against an employee because she has made "a charge . . . in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). In order to establish a prima facie case of retaliation, a plaintiff must show (1) that she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action. See, e.g., Id. at 552; Patane v. Clark, 508 F.3d 106, 155 (2nd Cir. 2007).  The Supreme Court has recently held a materially adverse action is one which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) At the summary judgment stage, if the plaintiff is able to make out a prima facie case, the burden then shifts to the defendant to proffer a legitimate, non-retaliatory reason for the adverse employment action. If the defendant does so, the employee must point to evidence sufficient to permit an inference that the employer's proffered reason is pretextual, and that retaliation was "a

substantial reason for the adverse employment action," in order to survive a motion for summary judgment.  Kaytor, 609 F.3d at 552 (quoting Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2nd Cir. 2005).

Genuine issues of material fact remain about whether Lyddy's transfer was in retaliation for her allegations of sexual harassment.  She has made out a prima facie case of retaliation because she spoke out about Cimmino's behavior, and her participation was known to her employer.  Although the Board argues that Lyddy's complaints were not "known" to the Board until she filed her CHRO complaint in December 2004, by crediting Lyddy's testimony and affidavit that she did make calls to other district officials in the spring and summer, her complaints would have been "known to the Board."  Lyddy has also offered evidence that she suffered a materially adverse employment action when she was transferred to another school in the fall of 2004.  There is no evidence that she sought to transfer to another school.  Although she did not suffer a reduction in wages or hours at her new position, she had worked at the Hooker School for 14 years before her transfer.  Such a disruption in one's career "might have dissuaded a reasonable worker" from speaking up about Cimmino's behavior.  Finally, Lyddy has offered evidence to show a causal connection existed between her statements about Cimmino's conduct and her transfer, stating that Assistant Superintendent Britto told her and Marcoccia that if their complaints did not cease, they would be transferred.  Lyddy Aff. ¶16, April 26, 2010, ECF No. 217, Ex. 3.

In response to Lyddy's prima facie case, the Board has proffered a legitimate, non-retaliatory reason for her transfer.  In Pannozzo's declaration she states Lyddy was "assigned as a secretary at Park City Magnet School, where there was a need for clerical support." Pannozzo

Dec. ¶14, March 1, 2010, ECF No. 199, Ex. A.[6]  However, Lyddy has also offered evidence that the need for clerical support at the other school is mere pretext, and that retaliation was a substantial reason for her transfer.  Lyddy said that Assistant Superintendent Britto told her and Marcoccia that if they continued to speak about Cimmino's behavior they would be transferred. Interpreting the facts in the light most favorable to Lyddy, a reasonable jury could conclude that her sexual harassment allegations, and not a secretarial vacancy at another school, was the reason for her transfer.  Therefore, summary judgment as to Lyddy's retaliation claim is denied.

Marcoccia also brings a retaliation claim.  Whether she is able make out a prima facie case of retaliation hinges on whether her transfer to a new school in the fall of 2004 constitutes a "materially adverse employment action."  She stated in her affidavit that she sought a transfer in May of 2004 in order to work for Sandra McLeod, another principal in the district. See Marcoccia Aff. ¶12, April 26, 2010, ECF No. 218.  She was in fact transferred to McLeod's school in 2004.  While this transfer does not initially seem to be a "materially adverse employment action"—since a transfer Marcoccia desired and actively sought is, by definition, not "adverse"—Marcoccia argues that she was "constructively transferred." She argues that her working conditions at the Thomas Hooker school were made so intolerable by Cimmino's conduct that she felt she had no choice but to ask to be moved to another school.[7]  In making this

---

[6]Counsel for the Board reiterated this reason for Lyddy's transfer at oral argument on these motions.

[7]It does not appear from the pleadings that Marcoccia (or Lyddy, for that matter) brings an adverse employment action claim based on the transfer.  Rather, the Fourth Amended Complaint says that "By transferring Mrs. Lyddy and constructively transferring Mrs. Marcoccia to positions in which their career opportunities were limited, defendant Board has disciplined and penalized them."  Pls.' Fourth Am. Compl. ¶33, September 4, 2009, ECF No. 163.  The Court interprets this paragraph as claims of retaliation, and interprets Marcoccia's "constructive transfer"

argument, Marcoccia's borrows from the line of cases that have held an employee who voluntarily resigns can nevertheless hold his employer liable for a "constructive discharge" when "his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily."  Terry v. Ashcroft, 336 F.3d 128, 151–152 (2nd Cir. 2003).  Several federal courts have recognized a constructive transfer claim. See, e.g., Barclay v. Michalsky, 451 F.Supp.2d 386, 397 (D.Conn. 2006) (finding a transfer instigated by the plaintiff to be a constructive transfer and thus, an adverse employment action for the purposes of a First Amendment retaliation claim); Akins v. Fulton County, Ga., 420 F.3d 1293, 1301 (11th Cir. 2005) (stating the court is not prevented from recognizing new adverse employment actions, such as constructive transfer, for purposes of First Amendment retaliation claims); White v. Dial Corp., 1995 WL 218535 at *4 (7th Cir. 1995) (finding insufficient evidence of constructive transfer).  Although the Second Circuit has yet to recognize a  constructive transfer as a materially adverse employment action for the purposes of a Title VII retaliation claim, the Court does not believe Marcoccia's retaliation claim should fail simply because she sought a transfer instead of resigning. To consider a constructive transfer, like constructive discharge, to be a materially adverse employment action accomplishes that purpose. Interpreting the facts in the light most favorable to Marcoccia, she felt compelled to seek a transfer to another school against her wishes, after having worked at the Thomas Hooker School for 16 years.  Because her situation "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," she has established that she suffered a materially adverse employment action.

Therefore, Marcoccia has made out a prima facie case of retaliation.  The Board has

---

argument in that context.

failed to proffer a legitimate, non-retaliatory reason for the transfer. Summary judgment as to Marcoccia's retaliation claim is denied.

### D. Intentional Infliction of Emotional Distress Claims against Cimmino

In addition to their Title VII claims, Lyddy and Marcoccia also both bring a common law claim of intentional infliction of emotional distress against Cimmino. To state a claim for intentional infliction of emotional distress, a plaintiff must allege "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." Appleton v. Bd. of Educ., 757 A.2d 1059, 1063 (Conn. 2000). Whether the defendants' conduct was extreme and outrageous is the initial question for the court to address. Edwards v. New Opportunities Inc., No. 3:05CV1238, 2007 WL 947996, at *7 (D. Conn. Mar. 26, 2007). Only if reasonable minds could disagree does it become an issue for the jury to decide. Adams v. Hartford Courant & Tribune Co., No. 303CV0477, 2004 WL 1091728, at *4 (D. Conn. May 14, 2004).

Both federal and state courts in Connecticut have interpreted the qualification of "extreme and outrageous conduct" strictly. Golnik v. Amato, 299 F. Supp. 2d 8, 15–16 (D. Conn. 2003). Liability can only be imposed if the conduct "exceeds all bounds usually tolerated by decent society" and is "of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." Buster v. City of Wallingford, 557 F. Supp. 2d 294, 301 (D. Conn. 2008). The suffering must be "so severe that no reasonable person could be expected to endure it." Id. at 302. A "routine employment action, even if made with improper motivations,

does not constitute extreme or outrageous behavior." <u>Edwards</u>, 2007 WL 947996, at *7 (internal

quotations omitted). Additionally, "insults, verbal taunts, threats, indignities, annoyances, petty

oppressions or conduct that displays bad manners or results in hurt feelings" do not reach the

standard of offensive conduct. <u>Buster</u>, 557 F. Supp. 2d at 301–02 (<u>citing</u> <u>Miner v. Town of</u>

<u>Cheshire</u>, 126 F. Supp. 2d 184, 195 (D. Conn. 2000)).

 Although Connecticut courts have set a high bar for succeeding on claims of intentional

infliction of emotional distress when the alleged outrageous conduct is sexually explicit

comments and behaviors, a reasonable jury could find that Cimmino's conduct in this case meets

that bar. <u>See, e.g.</u>, <u>Colapietro v. Dep't of Motor Vehicles</u>, No. 08cv238, 2010 WL 2596519

(D.Conn. June 24, 2010) (denying summary judgment of plaintiff's claim of intentional infliction

of emotional distress when colleagues had bikini-clad girl on a computer screen saver, showed

her sexually explicit websites, and generally created an overtly sexual work environment);

<u>Benton v. Simpson</u>, 78 Conn.App. 746 (2003) (affirming judgment that plaintiffs had suffered

intentional infliction of emotional distress when defendant repeatedly made cruel, disparaging

comments to women he supervised). Assuming the plaintiffs' facts are true, a jury could

certainly find that Cimmino's sexualized comments and behaviors were extreme and outrageous.

The Court cannot hold otherwise as a matter of law. Cimmino's motion for summary judgment

on the plaintiffs' claims of intentional infliction of emotional distress is denied.


## IV. Conclusion

 Because Marcoccia failed to exhaust her administrative remedies before the CHRO,

summary judgment is granted as to her Title VII hostile work environment claim. However,

summary judgment is denied as to Lyddy's Title VII hostile work environment claim and both plaintiffs' Title VII retaliation claims. Summary judgment is denied as to both plaintiffs' claims against Cimmino of intentional infliction of emotional distress.

The Board's Motion for Summary Judgment [Dkt. # 199] is GRANTED in part and DENIED in part. Cimmino's Motions for Summary Judgment [Dkt. #203 and Dkt. #206] are DENIED. Cimmino's Motion to Strike [Dkt. #221] is DENIED. The Board's Motion to Strike [Dkt. # 235] is GRANTED.

So ordered this  15th  day of November, 2010 at Hartford, Connecticut.


 /s/ Christopher F. Droney
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**